[Cite as *State v. Hemmelgarn*, 2019-Ohio-2034.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-7 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-113 |
| | : | |
| ERIC J. HEMMELGARN | : | |
| | : | (Criminal Appeal from |
| Defendant-Appellant | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of May, 2019.

. . . . . . . . . . .

DEBORAH S. QUIGLEY, Atty. Reg. No. 0055455, Darke County Prosecutor's Office, Appellate Division, 504 S. Broadway Street, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee

PAUL E. WAGNER, Atty. Reg. No. 0067647, 507 S. Broadway Street, Greenville, Ohio 45331
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Eric J. Hemmelgarn appeals from his conviction following a bench trial on charges of gross sexual imposition and disseminating matter harmful to juveniles.

{¶ 2} Hemmelgarn advances six assignments of error. The first two challenge the legal sufficiency and manifest weight of the evidence to sustain his convictions. Third, he contends the trial court improperly admitted into evidence his responses to hypothetical scenarios relating to drug use. Fourth, he claims the trial court was prejudiced by its admission of irrelevant evidence. Fifth, he asserts that a police officer's testimony about the recovery and analysis of cell-phone data improperly was admitted as lay testimony. Sixth, he alleges that cumulative error deprived him of a fair trial.

{¶ 3} The record reflects that Hemmelgarn was charged with the offenses set forth above for reaching inside the pants of his 12-year-old daughter "Susan" and rubbing her vagina while showing her a pornographic video on his cell phone.[1] At trial, Susan engaged in the following discussion with the prosecutor about the incident, which occurred while she was home with her father and two younger siblings, who were asleep or in bed:

Q. Okay. [Susan], back in the end of August, 2017 until the early part of September, 2017, was there a time when something happened with your dad that made you very upset?

A. Yes.

Q. And what happened?

A. I was sitting on the couch and—

Q. This is in your living room at your house?

---

[1] We will use the fictitious name "Susan" to identify the victim and preserve her privacy.

A. Yes.

Q. About what time?

A. It would have been around 9:00, 10:00.

Q. Okay. Are we talking morning or night?

A. Night.

* * *

Q. All right. You're sitting on the couch. Is your dad home?

A. Yes.

Q. And where is he?

A. He was sitting on the couch.

Q. And what was your dad doing?

A. He was trying to force his hands down my pants while showing me a video.

Q. Okay. Where was the video?

A. On his phone.

Q. Okay. Tell me about the video.

A. It was about a father/daughter and she was in the bathroom wearing a towel and he was going to—looks like he was going to bed and they ended up having sex.

Q. Okay. Was there a title there that you saw?

A. Yes.

Q. And what was the title?

A. "Dad F's little girl."

Q. Okay. You said that she's in a towel. Can you tell me what did you see?

A. She was in a towel and the father ended up taking the towel off and she was naked, and he stuck his thing inside of her.

Q. Okay. When you say he stuck his thing inside of her, what do you mean?

A. I don't know how to put it. She was bent over the toilet and he was like behind her and that's how he stuck it in.

Q. Okay. How long are you watching this video?

A. I don't remember.

Q. And what is your dad doing?

A. Trying to get his hand down my pants.

Q. Tell me what are you wearing?

A. I was wearing sweat pants, like a grayish colored sweat pants with gold rings around the ankles, and that's all I can remember. I don't remember the shirt I was wearing.

Q. Did you have underwear on?

A. Yes.

Q. Okay. And you said your dad was trying to put his hand down your pants, your pants or your underwear?

A. My underwear.

Q. And what part is he touching?

A. The front part.

Q. Okay. What do you mean by "front part"?

A. My vagina.

Q. And what is he doing with his hand?

A. He's trying to force it down my pants and there was a moment of weakness, like, and he ended up getting able to put it down and he was, like, rubbing.

Q. Okay. He was rubbing?

A. Yes.

Q. What was he rubbing?

A. My vagina.

(Trial Tr. at 14-18.)

{¶ 4} Susan testified that the incident stopped when she got up to help a younger sibling who had gotten out of bed. After helping the child, Susan left the house and ran next door, where she told some of her friends what had happened. (*Id.* at 18-19.) While she was there, Hemmelgarn came over. He stated that she was "crazy" and "just mad" at him. Susan returned home with Hemmelgarn and went into her bedroom and locked the door. (*Id.* at 19.)

{¶ 5} On cross examination, Susan testified that the incident with Hemmelgarn occurred toward the end of August before school started for the year. (*Id.* at 22, 24-25.) On re-direct examination, she testified that about one week passed after the incident before she talked to police, which occurred on September 12, 2017. (*Id.* at 27, 45.) She agreed that this meant the incident possibly occurred in September. (*Id.* at 27.) On re-cross examination, however, Susan testified again that the incident occurred before

school started for the year. (*Id.* at 28.) Then on further direct examination, she stated that she was "not sure of the date" and that the incident could have occurred about one week before she talked to the police. (*Id.*) On further re-cross examination, Susan remembered that it happened before school started.[2] (*Id.* at 29.)

{¶ 6} The next witness was Greenville police officer Jason Marion. He testified that he spoke with Susan about the incident on September 12, 2017. He then interviewed Hemmelgarn at the police department on September 13, 2017 and again on September 14, 2017. (*Id.* at 45-46.) After the first interview, Marion and another officer followed Hemmelgarn back to his house and obtained his cell phone. With Hemmelgarn's consent, Marion copied the phone's hard drive. (*Id.* at 46-47.) He then extracted data from the phone and generated a report dealing primarily with the phone's "Web and browser history," most of which had been deleted on September 13, 2017 before police obtained the phone. (*Id.* at 48, 51-53.)

{¶ 7} During both of Hemmelgarn's interviews, he denied Susan's allegations. (*Id.* at 54.) In the second interview, however, he "started to indicate that perhaps he was watching pornography on his phone and the children walked by and accidentally saw it." He also "started to get into the fact that he was addicted to crack cocaine and that because of his addiction to crack cocaine that that caused him to watch pornography and he kind of led into that when he smoked crack cocaine sometimes he didn't remember doing specific things like looking at pornography." (*Id.* at 54-55.) At one point, Marion asked Hemmelgarn "if it was possible that if he was so high on crack cocaine that he

---

[2] The significance of the timing is that police found a pornographic video on Hemmelgarn's cell phone that had been accessed in early September 2017.

could have touched [Susan] and not remembered and he said it could have been a possibility." (*Id.* at 56.)

{¶ 8} Following this portion of Marion's testimony, the State played excerpts of Hemmelgarn's second interview. The State explained that it was playing the excerpts rather than another recording of the whole interview to keep out portions that contained inadmissible hearsay. (*Id.* at 57-58.) Defense counsel's only objection was that the State shortened version "took out much more than what was just inadmissible."(*Id.* at 58.) The trial court overruled the objection, noting that it would allow Hemmelgarn to use the recording of the entire interview and play any additional portions that he believed were necessary. (*Id.* at 58-61.)

{¶ 9} After the interview excerpts were played, Marion testified about a report on the cell phone data extraction. When asked whether there was "anything in the report within the time frame between August and September 12th with regard to fathers and daughters," Marion responded affirmatively. (*Id.* at 64.) He added that "[t]here were multiple dates on inferences like that." (*Id.*)

{¶ 10} On cross examination, Marion acknowledged that the data-extraction report showed no internet searches on Hemmelgarn's phone during the month of August 2017. (*Id.* at 69.) He noted that a video could have been saved on the phone without a web search, but he did not find any videos of saved "child porn." (*Id.* at 70.) Marion then acknowledged that when he spoke with Susan, she claimed Hemmelgarn had showed her "child porn." (*Id.* at 71.) In particular, Susan told Marion "that the child that she saw in the video was about her age." (*Id.* at 72.) When Marion searched Hemmelgarn's cell phone, he found browser searches from September 2017 that were "close" to what Susan

had described. (*Id.*) On re-direct examination, Marion testified about Hemmelgarn admitting crack cocaine took over him. Marion also agreed that when Hemmelgarn was asked about touching his daughter, he denied having any recollection of doing so. (*Id.* at 84.) Finally, Marion testified that he became involved in the case after Hemmelgarn's neighbor contacted the police department on September 12, 2017. (*Id.* at 85.) According to Marion, the neighbor reported hearing allegations involving Susan and Hemmelgarn for about three days before she contacted the police. (*Id.* at 86, 88.) Following Marion's testimony, the State rested.

{¶ 11} Kent Warner then testified as a defense witness. Warner identified himself as a relative of Hemmelgarn and Susan. He explained that Hemmelgarn's "mother is [his] wife's step sister." (*Id.* at 93.) He considered Hemmelgarn his nephew and Susan his great niece. (*Id.*) At the time of trial, Susan was living with Warner and his wife as a result of Darke County Children Services placing the child there due to the allegations against Hemmelgarn. (*Id.* at 93-95.) Warner testified that about a week before police became involved in the case, he asked Susan whether Hemmelgarn had been doing "bad things." According to Warner, Susan told him she knew what he was talking about and denied that anything had happened. (*Id.* at 99-100.) After the police became involved, Susan talked to Warner again and allegedly told him, "Daddy did do it." (*Id.* at 102.) Warner testified, however, that the only specific conduct she acknowledged was Hemmelgarn putting his hand down the back of her pants and squeezing her "butt." (*Id.* at 102.) Warner proceeded to testify that "at times" it is difficult to tell when Susan is telling the truth. (*Id.* at 103.) On cross examination, however, Warner stated that lying was not a "consistent problem" for Susan. (*Id.* at 109.) Following Warner's testimony, defense counsel rested.

{¶ 12} The trial court ruled from the bench the following day and found Hemmelgarn guilty of gross sexual imposition, a felony of the third degree, and disseminating matter harmful to juveniles, a felony of the fourth degree. (Sentencing Tr. at 3.) For the gross sexual imposition, the trial court imposed a 12-month prison sentence with five years of mandatory post-release control and sex-offender registration requirements. It imposed five years of community control for disseminating matter harmful to juveniles. (*Id.* at 10-12.) The trial court memorialized the conviction and sentence in an August 8, 2018 judgment entry. (Doc. #18.) This appeal followed.

{¶ 13} In his first assignment of error, Hemmelgarn challenges the legal sufficiency of the State's evidence to sustain his convictions. In support, he cites Warner's testimony about Susan denying that anything happened and then claiming he squeezed her butt. He also contends Susan falsely claimed he had her watch "child porn" when no legally-defined child porn was found on his phone. He further alleges that inconsistent testimony was presented as to precisely when the offenses occurred and whether three days or one week elapsed between the offenses and police being contacted. Hemmelgarn contends the only link to a pornographic video on his cell phone was from September 8, 2017, and police were notified on September 12, 2017, which was not one week later. He argues that this contradicted Susan's testimony that one week elapsed between the incident and police being notified. Hemmelgarn also argues that no one corroborated her allegations, which he repeatedly denied. To the extent that he eventually "hedged" and agreed it was possible the incident could have occurred without him remembering it if he was high on crack cocaine, Hemmelgarn argues that this was a hypothetical situation, not an admission. For all of the foregoing reasons, he contends the evidence was legally

insufficient to sustain either of his convictions.

{¶ 14} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 15} With the foregoing standards in mind, we conclude that Hemmelgarn's convictions were supported by legally sufficient evidence. Susan's testimony, alone, if believed, was legally sufficient to sustain his convictions for gross sexual imposition and disseminating matter harmful to juveniles. The portion of her testimony quoted above establishes the essential elements of both offenses. Hemmelgarn's various arguments challenge Susan's credibility and the believability of her trial testimony. But witness credibility is not a proper matter for review when assessing legal sufficiency of the evidence. *State v. Sibole*, 2d Dist. Clark No. 2017-CA-68, 2018-Ohio-3203, ¶ 23. Accordingly, the first assignment of error is overruled.

{¶ 16} In his second assignment of error, Hemmelgarn asserts that his convictions were against the manifest weight of the evidence. He advances a number of arguments in support. He suggests that Susan had a motive to lie because she testified that she

disliked him being gone for hours at a time without explanation or spending time with his friends. Hemmelgarn theorizes that Susan may have wanted to live with her great aunt and uncle rather than him and that she made up her allegations to get what she wanted. He also cites Kent Warner's testimony that it sometimes is hard to tell when Susan is lying. Hemmelgarn reasons that the trial court could not be expected to determine whether Susan's testimony was truthful if Warner, a relative, had a hard time ascertaining her veracity.

{¶ 17} Hemmelgarn also notes that the case began with a report from a neighbor that he had raped Susan, which was not true. He suggests that Susan was the source of this untruthful allegation and, therefore, that her trial testimony lacked credibility. As for the pornographic video he allegedly showed Susan, Hemmelgarn contends the State provided insufficient details to support a finding that he forced her to watch such a video. He suggests that Susan may have watched a pornographic video herself or with friends, or she may have lied about the entire incident. Hemmelgarn further argues that Susan may have used his phone and found the video herself.

{¶ 18} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 19} Here Hemmelgarn's convictions were not against the weight of the evidence. With regard to Susan's credibility, veracity, and a possible motive to lie, these matters were primarily for the trier of fact to resolve. Although we are entitled to assess witness credibility in a manifest-weight review, we extend substantial deference to the fact-finder's determinations of credibility and which testimony to believe. *State v. Stanaford*, 2d Dist. Montgomery No. 27940, 2019-Ohio-1377, ¶ 32. We are somewhat less deferential when deciding which of multiple competing inferences suggested by the evidence should be preferred. *State v. Hawkins*, 2d Dist. Montgomery No. 27019, 2018-Ohio-867, ¶ 57.

{¶ 20} With regard to Susan's credibility, the trial court reasonably could have believed her testimony about Hemmelgarn rubbing her vagina and showing her a pornographic video. Although Susan described the video as "child porn" (Trial Tr. at 70), the trial court was not required to conclude that she was speaking in a legal sense. Rather, the trial court reasonably concluded that she meant the video depicted what appeared to be a father and his young-looking daughter. (*Id.* at 70-71.) The fact that no legally-defined "child porn" was found on Hemmelgarn's cell phone was a matter for the trial court to assess in determining Susan's credibility. Moreover, although the record contains conflicting evidence about whether the offenses occurred three days or one week before police were notified, Susan acknowledged that she was "not sure of the date." (*Id.* at 28.) On appeal, Hemmelgarn admits that a link to a pornographic video on his cell phone was from September 8, 2017, and police were notified on September 12, 2017, which was four days later. In our view, the timing issue was again a matter for the trial court to resolve

when assessing witness credibility.

{¶ 21} As for Hemmelgarn's argument about the case beginning with an inaccurate report from a neighbor that he had raped Susan, no evidence established that Susan was the source of that allegation. (*Id.* at 82.) Susan testified that, after Hemmelgarn touched her and showed her the video, she ran next door and told several of her friends what had happened. (*Id.* at 18.) It appears that the mother of one or more of these friends reported the incident to police a few days later and, in so doing, may have gotten the specifics wrong. (*Id.* at 83, 85.) Finally, with regard to the video, we simply disagree with Hemmelgarn's assertion that the State presented "insufficient details" to support a finding that he forced Susan to watch it. At trial, Susan provided a fairly detailed description of the video's contents as well as the circumstances surrounding her viewing of it. Hemmelgarn's suggestion that she may have taken his phone and watched the video herself, or that she may have seen such a video with friends, was a matter for the trial court to consider when assessing her credibility.

{¶ 22} Based on our review, we do not find that the trial court clearly lost its way and created a manifest miscarriage of justice when resolving conflicts in the evidence. This is not an exceptional case in which the evidence weighed heavily against Hemmelgarn's convictions. His second assignment of error is overruled.

{¶ 23} In his third assignment of error, Hemmelgarn contends the trial court erred in admitting into evidence his responses to hypothetical scenarios regarding drug use. More specifically, he challenges the trial court's admission of his recorded second interview at the police department. He claims the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. He asserts that the "heavily

edited" excerpts played by the prosecutor showed police asking about his drug history, the effects of his drug use, and whether he might have touched Susan without remembering while under the influence of drugs. According to Hemmelgarn, the excerpts played by the prosecutor omitted his "vigorous denials" and attempts by police to get him to change his story. Hemmelgarn also contends the questions about his drug use and memory loss were irrelevant because the State presented no evidence that he used or possessed drugs on the day in question.

{¶ 24} Upon review, we find Hemmelgarn's arguments to be unpersuasive. Before the recording was played, Marion testified without objection about what Hemmelgarn said during the second interview:

> Again, he initially denied the allegations. He started to indicate that perhaps he was watching pornography on his phone and the children walked by and accidentally saw it. Then he started to get into the fact that he was addicted to crack cocaine and that because of his addiction to crack cocaine that that caused him to watch pornography and he kind of led into that when he smoked crack cocaine sometimes he didn't remember doing specific things like looking at pornography. So we talked a lot of that.

(Trial Tr. at 54-55.)

{¶ 25} Marion then added the following regarding his second interview with Hemmelgarn:

> And then when I brought up the fact that he was—he had stated that when—sometimes when he smokes crack cocaine he doesn't remember certain things, I asked him if it was possible that if he was so high on crack

cocaine that he could have touched [Susan] and not remembered and he said it could have been a possibility.

(*Id.* at 56.)

{¶ 26} After this portion of Marion's testimony, the State attempted to play a recording of the second interview. Defense counsel objected to playing the entire interview on the basis that it included inadmissible hearsay. (*Id.* at 57.) The State agreed that playing the entire recording would be improper. For that reason, it proposed playing an edited version (State's Exhibit 4) containing admissible portions of the interview. (*Id.* at 58.) The trial court asked whether defense counsel objected to that approach. Defense counsel responded that the State had omitted "much more than what was just inadmissible," thereby removing Hemmelgarn's statements from their proper context. (*Id.*) The trial court explained that it would allow the defense to introduce any additional portions of the recorded interview deemed necessary to provide context. (*Id.* at 58-60.) Based on that ruling, the trial court admitted the State's excerpts of the interview (State's Exhibit 4) but did not allow the State to play the full interview (State's Exhibit 3.) The trial court then viewed the excerpts of the interview. (*Id.* at 62.) On cross examination, defense counsel questioned Marion about the second interview but did not attempt to introduce any additional parts of the interview from the full recording. (*Id.* at 76-81.)

{¶ 27} We see no error in the trial court's handling of the interview issue. Defense counsel's only objection to the State playing the recording containing excerpts of the interview was that it took Hemmelgarn's statements out of context. In response to this objection, the trial court authorized defense counsel to supplement the State's evidence with anything else from the full recording that counsel thought necessary. The trial court

acted within its discretion in dealing with the issue this way. As for Hemmelgarn's specific appellate arguments about the danger of unfair prejudice and a lack of relevance, he does not appear to have raised these issues below. In any event, the trial court reasonably could have found that the discussion about Hemmelgarn's drug use and memory loss was relevant and that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice for purposes of Evid.R. 403(A). Marion's testimony and Hemmelgarn's statements during the interview supported an inference that he may have acted under the influence of drugs at the time of the incident in question. The third assignment of error is overruled.

{¶ 28} In his fourth assignment of error, Hemmelgarn contends the trial court, as the trier of fact, was prejudiced by the admission of irrelevant evidence of his drug addiction. His substantive argument is as follows:

Evidence of [Hemmelgarn's] drug addiction in State's Exhibit Four was not relevant to making any fact of consequence to the determination of the action more or less probable than it would be without the evidence because the State presented no evidence that [Hemmelgarn] was high or possessed any drugs on September 8, 2017. Because of this lack of probative value, [Hemmelgarn's] addiction and potential memory loss could only be presented to prove [Hemmelgarn] allegedly acted in conformity with his addiction. The admission of evidence of drug use and memory loss due to drug [use] was highly prejudicial and presented [Hemmelgarn] in a highly damaging light. Given the lack of evidence supporting the State's argument and the inflammatory nature of [Hemmelgarn's] history of addiction, the

prejudice caused by the admission of the evidence contributed to this conviction.

(Appellant's brief at 17-18.)

{¶ 29} Hemmelgarn's argument lacks merit. As a threshold matter, he failed to raise an Evid.R. 404(B) other-bad-acts objection to the admission of evidence about his drug use. He never objected at all to Marion's testimony, quoted above, about his drug use, and his only objection to the interview recording was that it had been taken out of context. In any event, the record supports an inference that Hemmelgarn may have acted under the influence of drugs when touching Susan inappropriately and showing her a pornographic video. While denying that he touched Susan, Hemmelgarn arguably acknowledged as much when he admitted to Marion that "it was possible that if he was so high on crack cocaine that he could have touched [Susan] and not remembered[.]" (Trial Tr. at 56.) The fourth assignment of error is overruled.

{¶ 30} In his fifth assignment of error, Hemmelgarn contends the trial court erred in admitting Marion's testimony regarding "Cellebrite" software as lay-witness testimony. In particular, he challenges Marion's testimony about the extraction of data from his cell phone using a Cellebrite program. Hemmelgarn argues that Marion's testimony about using the Cellebrite program to collect data from his cell phone required Marion to be qualified as an expert witness, which was not done. Therefore, he argues that all testimony regarding Cellebrite was inadmissible and, without it, that the remaining evidence did not support his convictions.

{¶ 31} At trial, Marion started to testify about his training in the use of Cellebrite to examine cell phones and collect data. Defense counsel objected on the grounds that

Marion needed to be qualified as an expert in that area. (Trial Tr. at 31.) The State responded that it was not presenting Marion as an expert witness. It argued that he could testify about his use of the Celebrite program as a lay witness. (*Id.* at 32.) In support, it cited two cases, *State v. Calhoun*, 8th Dist. Cuyahoga No. 105442, 2017-Ohio-8488, and *State v. Shine*, 2018-Ohio-1972, 113 N.E.3d 160 (8th Dist.).

**{¶ 32}** The trial court held Hemmelgarn's objection in abeyance while it heard testimony about Marion's training with Cellebrite. (*Id.* at 34.) Marion proceeded to testify that he underwent two weeks of online training culminating in a 90-minute examination, which he passed. (*Id.* at 35.) As a result, he was a "Cellebrite Certified Logical Operator and Cellebrite Certified Physical Analyst." (*Id.* at 36.) Marion explained these certifications: "Logical operator just means that I'm certified to actually take the evidence and to extract the information from it. * * * The other side is the analyst side of it where I'm actually certified to take the extraction and break it down and review it[.]" (*Id.*) Marion then testified he and one other officer had "done a lot of phones" since obtaining Cellebrite certification. (*Id.*) The process involved taking a phone and cloning the SIM card, copying the hard drive, and enabling the Cellbrite program to extract available data. The types of data typically extracted might include browser history as well as "call logs, texting logs, texting content, chat messages, social media messages, photos, videos, [and] calendars." (*Id.* at 37-43.)

**{¶ 33}** After Marion explained his Cellbrite qualifications and experience, the trial court overruled Hemmelgarn's objection and allowed the officer to testify "as a lay witness with regard to extracting and analyzing cell phone data." (*Id.* at 43.) Marion then testified about obtaining Hemmelgarn's cell phone and using the Cellebrite program to extract

data. (*Id.* at 46-47.) He identified State's Exhibit 1 as "a copy of the extraction from the hard drive itself." (*Id.* at 47.) He identified State's Exhibit 2 as a "report generated from the digital extraction." (*Id.* at 48.) According to Marion, the report identified the content that was able to be extracted from the phone. (*Id.* at 51.) It also showed what content had been deleted from the phone prior to its examination. (*Id.*) The remainder of the report showed the phone's web and browser history, most of which had been deleted on September 13, 2017 before police obtained the phone. (*Id.* at 51-53.) Marion also testified that "between August and September 12th" Hemmelgarn's cell phone showed "multiple dates on inferences" involving "fathers and daughters." (*Id.* at 64-65.)

**{¶ 34}** After reviewing Marion's testimony and pertinent case law, we see no error in the trial court allowing him to give lay-witness testimony about his use of the Cellebrite program. A lay witness may testify about opinions or inferences that are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. In the present case, most of Marion's testimony did not even involve opinions or inferences. He simply testified, factually, about extracting data from Hemmelgarn's phone using the Cellebrite program and listing that data in a generated report. All witnesses may testify as to facts within their personal knowledge. Evid.R. 602. To the extent that Marion did offer "opinion" testimony, he essentially opined that Cellebrite copies data from a phone. He based this "opinion" on knowledge he acquired through his own use of the program. Marion's testimony did not require a specialized understanding of the Cellebrite program, as the idea that data can be extracted from a cell phone is familiar to most people. Finally, to the extent that Marion arguably conducted any "analysis" of the data, he merely testified that

a generated report showed content that had been extracted from the phone and content that had been deleted prior to examination. Again, this factual testimony did not involve any real opinions requiring specialized knowledge, training, or experience. Therefore, we agree with the trial court that Marion did not need to be qualified as an expert to testify about his use of the Cellebrite program in this case.

{¶ 35} Our conclusion is consistent with the two Eighth District cases cited by the State. In both *Calhoun,* 8th Dist. Cuyahoga No. 105442, 2017-Ohio-8488, and *Shine*, 2018-Ohio-1972, 113 N.E.3d 160, the trial courts qualified officers as experts in data extraction using Cellebrite. On appeal in both cases, the Eighth District found no error while also noting that the officers could have testified as lay witnesses because expert testimony was unnecessary. *Calhoun* at ¶ 32; *Shine* at ¶ 98-99. Federal courts have reached the same conclusion under the analogous Federal Rules of Evidence. Most recently, the Fourth Circuit Court of Appeals addressed the issue as follows in *United States v. Chavez-Lopez*, Case No. 18-4183, 2019 WL 1562352, at *2-3 (4th Cir. Apr. 11, 2019):

Chavez-Lopez first contends that Yerry improperly gave expert opinion testimony. In Chavez-Lopez's view, Yerry's testimony about the extraction of the cellphone data necessarily involved an opinion about the accuracy of Cellebrite, which he says only an expert could offer. The district court twice overruled an objection to this effect. We review the district court's decision admitting this testimony for abuse of discretion. *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006).

All witnesses may testify to facts within their personal knowledge. But

for opinion testimony, the Federal Rules distinguish between reasoning familiar in everyday life and reasoning that requires expertise. *See United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007). Experts may thus offer opinions based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Lay witnesses, in contrast, may only offer opinions that are "rationally based on [their] perception," helpful to the jury, and not based on specialized knowledge. Fed. R. Evid. 701. So, a lay witness may testify that a substance looks like blood but not that certain bruises indicate head trauma. *See Perkins*, 470 F.3d at 155.

Under this standard, Yerry did not give expert testimony. First, Yerry did not offer an opinion. His brief testimony concerned the actions he took to extract the data—hooking the phones up to a computer, following a few prompts, and saving data onto an external drive. Yerry's role as a witness is, therefore, best characterized as testifying about facts in his personal knowledge.

Second, to the extent Yerry offered an opinion, it was lay testimony. Chavez-Lopez contends that Yerry implicitly vouched for Cellebrite's accuracy in extracting data. But Yerry offered no assurances about how well Cellebrite performed. At most, he offered the opinion that Cellebrite copies data from a cellphone, which he derived from his personal experience using the software. That testimony requires no more specialized knowledge than other opinions we have considered lay testimony, such as police officers' testimony that a substance they observed was methamphetamine, that a

shorthand statement made to them carried a certain meaning, or that an observed use of force was objectively reasonable. *United States v. Hoston*, 728 F. App'x 223, 224 (4th Cir. 2018); *United States v. Min*, 704 F.3d 314, 324–25 (4th Cir. 2013); *Perkins*, 470 F.3d at 156. Yerry's testimony didn't require a technical understanding of Cellebrite, and he made no claims about the program's effectiveness or reliability. He only testified about copying data from one drive to another, which is "the product of reasoning processes familiar to the average person in everyday life." *United States v. Baraloto*, 535 F. App'x 263, 271 (4th Cir. 2013) (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) ); *see also In re D.H.*, No. A140779, 2015 WL 514336, at *6 (Cal. Ct. App. Feb. 6, 2015) (holding that an officer gave only lay testimony about the extraction of data using Cellebrite because "[t]he idea that images may be downloaded from a cell phone is familiar to the general population").

For these same reasons, the Second Circuit has held that a police officer gave lay testimony when he discussed the extraction of data using Cellebrite. *See United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) (holding that an officer gave lay testimony because he "did not purport to render an opinion based on the application of specialized knowledge to a particular set of facts" when discussing the extraction of cellphone data through Cellebrite). Other courts have come to the same conclusion. *See United States v. McLeod*, 755 Fed.Appx. 670, 672-75 (9th Cir. 2019); *United States v. Seugasala*, 702 F. App'x 572, 575 (9th Cir. 2017); *D.H.*, 2015 WL

514336, at *6. *But see McLeod*, 755 Fed.Appx. at 676-77 (Molloy, J., dissenting in part and concurring in part) (contending that a detective who testified about data extraction using Cellebrite gave expert testimony without qualification).

**{¶ 36}** We find the foregoing analysis equally applicable here. For the reasons set forth above, we see no abuse of discretion in the trial court's decision to allow Marion to provide lay-witness testimony about his use of the Cellebrite program. The fifth assignment of error is overruled.

**{¶ 37}** In his sixth assignment of error, Hemmelgarn argues that cumulative error deprived him of his right to a fair trial. He asserts that the alleged errors addressed above, even if individually harmless, constituted prejudicial error when aggregated.

**{¶ 38}** It is true that separately harmless errors can violate a defendant's right to a fair trial when the errors are aggregated. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). To find cumulative error, we first must find multiple errors committed at trial. *Id.* at 398. We then must find a reasonable probability that the outcome below would have been different but for the combination of separately harmless errors. *State v. Thomas*, 2d Dist. Clark No. 2000-CA-43, 2001 WL 1103328, *9 (Sept. 21, 2001). Here, however, we have not found multiple instances of separately harmless error. That being so, we have nothing to aggregate. The sixth assignment of error is overruled.

**{¶ 39}** The judgment of the Darke County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Deborah S. Quigley
Paul E. Wagner
Hon. Jonathan P. Hein