[Cite as *State v. Taylor*, 2025-Ohio-353.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 19AP-396 |
| v. | : | (C.P.C. No. 17CR-3590) |
| Damon L. Taylor, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 4, 2025

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

**On brief:** *Carpenter Lipps & Leland, L.L.P., Kort Gatterdam, Erik P. Henry*, and *David F. Hanson*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
ON REMAND from the Supreme Court of Ohio

BEATTY BLUNT, J.

{¶ 1} This appeal comes to us on remand from the Supreme Court of Ohio, following that court's reversal of our decision overruling defendant-appellant, Damon L. Taylor's, first assignment of error but sustaining his second and third assignments of error and reversing his conviction. *See State v. Taylor*, 2024-Ohio-1752, *reversing State v. Taylor*, 2022-Ohio-2877 (10th Dist.) ("*Taylor I*"). The Supreme Court reversed our judgment in *Taylor I* as to Taylor's second and third assignments of error, concluding that our decision erred by determining that the Franklin County Court of Common Pleas lacked jurisdiction to convict Taylor of felony murder, *see Taylor I* at ¶ 20, and that we further erred by determining that Taylor's due process right to counsel under the Sixth Amendment to the United States Constitution was violated when he was interrogated outside the

presence of his counsel. *Id*. at ¶ 26, 28. The Supreme Court remanded this case to this court to consider Taylor's fourth, fifth, sixth, seventh, eighth, and ninth assignments of error, which this court had previously declined to address as moot. *See Taylor I* at ¶ 33-34.

{¶ 2} Taylor had appealed from the May 28, 2019 judgment of the Franklin County Court of Common Pleas sentencing him to an 18 years to life aggregate term of incarceration following a jury verdict of guilty of felony murder with a firearm specification. Taylor asserted nine assignments of error with the trial court's judgment. Pursuant to the Supreme Court's mandate, we must address his six remaining assignments of error:

> [IV.] The trial court abused its discretion by allowing testimony regarding Snapchat from a witness when there was a lack of foundation and lack of qualification of the testifying witness contrary to the Due Process Clause of the Ohio and United States Constitutions.
>
> [V.] The prosecutor engaged in misconduct during closing argument resulting in a denial of appellant's right to Due Process.
>
> [VI.] The trial court erred in providing a limiting instruction regarding law enforcement's interrogation tactics.
>
> [VII.] Appellant was deprived of the effective assistance of trial counsel in violation of appellant's rights under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10 and 16, Article I of the Ohio Constitution.
>
> [VIII.] The trial court violated appellant's rights to due process and a fair trial when it entered a judgment of conviction based on insufficient evidence and against the manifest weight of the evidence in violation of appellant's rights under the United States and Ohio Constitutions.
>
> [IX.] The imposition of an indefinite prison sentence of 15 years to life for murder violated the Eighth Amendment to the United States Constitution.

(Capitalization omitted.) We previously summarized the facts of Taylor's case as follows:

> The facts at trial indicated that late in the evening of April 14, 2016, Taylor either stole or borrowed his mother's car, which happened to contain his stepfather Michael Jackson's firearm, a Smith & Wesson MP40 semiautomatic pistol. Taylor met up with his friend (and his sister Dasha's boyfriend) Damion Wade, went to the home of his two sisters Dasha and Asha on Commons Road, and drank and smoked marijuana with Wade and Asha. At some point Taylor became agitated about the loss of a chain that he owned and apparently believed that it had

been stolen by [Enrique] Straughter, whom he had considered a friend. Straughter lived in the same apartment complex as Dasha and Asha, on Lavenham Road, which is well within walking distance of Commons Road.

Shortly after midnight on April 15, 2016, Reynoldsburg police were called to Lavenham on report of a shooting. They discovered Straughter on the ground with gunshot wounds, at the time still alive and struggling to breathe. He was pronounced dead shortly thereafter. Crime scene investigators examining the immediate area found three .40 caliber shell casings, four unfired .40 caliber bullets, a broken pistol slide rail, two red Nike Jordan sandals, and an electronic Chevrolet key fob. (*See* State's Ex. B to Bindover Hearing.) The key fob triggered the locks of a Chevy Malibu awkwardly parked about 200 feet away. The car belonged to Taylor's mother, who [had] reported the car stolen at approximately 3:30 a.m. on April 15, 2016 and also reported Taylor himself as missing since 11:45 the prior evening. She apparently followed up with the police to report that Taylor had not reported to school on April 15 either.

Based on this evidence, Reynoldsburg police obtained a search warrant for the apartment belonging to Taylor's two sisters. When they arrived at the apartment to execute the warrant, Taylor was there. It is unclear whether Taylor was arrested before or during the search of the apartment, but notwithstanding, police seized several cell phones from the apartment, one of which tied to a Bluetooth device and identified as "Damon Taylor." Police were eventually able to extract several Snapchat photos from this phone—one [of] the photos, time-stamped on April 14, 2016 at 11:33 p.m., shows a hand holding a Smith & Wesson pistol inside a Chevrolet, and another photo, taken at 10:55 a.m. on April 15 depicts Taylor laying back on a couch with his hand across his chest, and is captioned: "They tryna take me for murda." (State's Ex. C2 and C4 to Bindover Hearing.)

. . .

Subsequent DNA tests on the gun rail were found to contain a two-person DNA mixture, and the major contributor was identified as Straughter, while the minor contributor was identified as Taylor. (Apr. 12, 2019 Tr. at 1085.)

. . .

[O]n June 30, 2017 Taylor was indicted by the general division of the Franklin County Court of Common Pleas for aggravated murder, purposeful murder, and felony murder by felonious assault, each with a three-year gun specification. Following a

trial, Taylor was found guilty by a jury of felony murder by felonious assault with gun specification, and was found not guilty of the two other charges and specifications. On May 28, 2019, the trial court sentenced Taylor to 15 years to life plus 3 mandatory and consecutive years on the gun specification, for an aggregate sentence of 18 years to life.

*Taylor I* at ¶ 2-4, 9. Taylor's six remaining assignments of error assert error in the trial and sentencing proceedings, and we will address each assigned error in turn.

{¶ 3} In his fourth assignment of error, Taylor asserts that the trial court erred by admitting, over a continuing objection, the testimony of former Reynoldsburg Police Detective Brian Marvin regarding Snapchat and the data extracted from one of the phones seized during the execution of the search warrant. Defense counsel argues that Marvin lacked specialized training and education that would allow him to speak as an expert on Snapchat or cellphones and how their systems and software work, and that no foundation had been laid for such testimony. Notwithstanding, the trial court permitted Marvin to testify generally regarding the extraction of data using the Cellebrite extraction software, specifically pictures and Snapchat messages, the general process as to how that data was stored on a phone, and how, where, and for how long the Snapchat application and the Samsung phone it was extracted from stored that data. The trial court gave a limiting instruction to the jury—without objection—in conjunction with Marvin's testimony:

> Certain times people can give opinions or describe things based upon experience, knowledge, training. They're called experts. Okay? The question becomes here, the fight between [Taylor and the state] is, is he really an expert. Well, about anybody that can give an opinion that aids and assists the jury can be an expert, but you guys determine what value it becomes. You base it upon his experience, upon his training, what he's done, has he testified before about it, those types of issues, and you determine what value, if any, to give to his testimony.

(Apr. 10, 2019 Tr. at 652-53.) Defense counsel summarized his objection to Marvin's testimony as follows:

> I don't have a problem with him coming in and testifying for the purpose of why he's supposed to be testifying, which is I extracted the information from this phone with this software program which I am familiar with and have had training, Cellebrite, and these are the results. Going beyond that, talking about how an application works and the intentions of the

developer and/or how a cell phone works is way beyond his
area of . . . knowledge.

(Apr. 10, 2019 Tr. at 683.) Notably, defense counsel specifically stated that "[t]he documents are not what I have a problem with. Him testifying to the documents is not the problem. It's the—the going beyond that and testifying to the interworkings [sic] of a cell phone and an app. . . . I think it unfortunately will lead the jury to give him more credibility and it will bolster his testimony based on knowledge that he is proposing that has not -- there's not been a foundation laid. That -- there's my record." (Apr. 10, 2019 Tr. at 688.) The trial court overruled the objection, indicating that it thought that Marvin had displayed some specialized experience that could aid and benefit the jury, that the testimony was admissible under Evid.R. 702, that Taylor's objection was largely cross-examination material as to the strength of Marvin's experience and knowledge, that he did not "feel you've demonstrated a prejudice at this point in time," *id.*, and that it was "all weight and credibility as far as I'm concerned." (Apr. 10, 2019 Tr. at 683, 688.)

{¶ 4} The decision to admit or exclude evidence lies in the sound discretion of the trial court. *See, e.g., State v. Sage*, 31 Ohio St.3d 173, 180 (1987).

> Expert-witness testimony is generally admissible "if it will assist the trier of fact in search of the truth." Evid.R. 702 permits a witness to testify as an expert if (1) the "testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons[;]" (2) the witness "is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony[;]" and (3) the "testimony is based on reliable scientific, technical, or other specialized information."

*State v. McKelton*, 2016-Ohio-5735, ¶ 161, quoting *State v. Koss*, 49 Ohio St.3d 213, 216 (1990) and Evid.R. 702.

{¶ 5} The state observes that other districts have admitted testimony similar to Marvin's as both expert testimony and lay testimony. *See generally State v. Hemmelgarn*, 2019-Ohio-2034, ¶ 30-36 (2d Dist.) (discussing admission of Cellebrite testimony by expert witnesses and lay witnesses and collecting cases). It further argues that even if Marvin provided testimony regarding the technology of cellphones, that testimony was not prejudicial. Taylor responds that Marvin's testimony fails the first two prongs of the *McKelton* test, in that the testimony went beyond the knowledge or experience possessed

by laypersons, that he did not disclose any training he received on Snapchat or operating systems on phones, and that the trial court's instruction only served to bolster his credibility.

{¶ 6} In *Hemmelgarn*, the Second District held:

> [W]e see no error in the trial court allowing [the witness] to give lay-witness testimony about his use of the Cellebrite program. A lay witness may testify about opinions or inferences that are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. In the present case, most of [the witness]'s testimony did not even involve opinions or inferences. He simply testified, factually, about extracting data from Hemmelgarn's phone using the Cellebrite program and listing that data in a generated report. All witnesses may testify as to facts within their personal knowledge. Evid.R. 602. To the extent that [the witness] did offer "opinion" testimony, he essentially opined that Cellebrite copies data from a phone. He based this "opinion" on knowledge he acquired through his own use of the program. [The witness]'s testimony did not require a specialized understanding of the Cellebrite program, as the idea that data can be extracted from a cell phone is familiar to most people. Finally, to the extent that [the witness] arguably conducted any "analysis" of the data, he merely testified that a generated report showed content that had been extracted from the phone and content that had been deleted prior to examination.

*Hemmelgarn* at ¶ 34-35. *See also State v. Calhoun*, 2017-Ohio-8488, ¶ 33-36 (8th Dist.); *State v. Shine*, 2018-Ohio-1972, ¶ 98-99 (8th Dist.) (finding that officer testimony regarding data extracted from a phone using Cellebrite was admissible expert testimony).

{¶ 7} We find *Hemmelgarn* persuasive, and believe it directly applies to Taylor's case. Marvin was properly qualified as an expert as to the extraction of cellphone data using Cellebrite, and insofar as he testified as to the workings of Snapchat, he testified that it was based on "exposure through cases and through personal use." (Apr. 10, 2019 Tr. at 651.) Our review of his testimony regarding the storage of images on cellphones, how those phones interact with Snapchat, and how those images could be retrieved using Cellebrite was limited to providing a very general understanding to the jury of how cellphone data is stored and can be extracted, much like the testimony approved in *Hemmelgarn*. And Taylor's trial counsel explicitly waived any objection to the instruction he now argues prejudiced him. (Apr. 10, 2019 Tr. at 653.)

{¶ 8} Even if we were to accept Taylor's arguments, he does not identify how the jury was misled by Marvin's testimony, or what specific prejudice he could possibly have suffered from that testimony. In accordance with *Hemmelgarn,* we cannot and do not conclude that allowing Marvin to provide basic background information that may have been somewhat beyond his specific expertise was erroneous. But even if we assume that it was error, it was not prejudicial and does not constitute an abuse of the trial court's discretion. Taylor's fourth assignment of error is therefore overruled.

{¶ 9} Taylor's fifth assignment of error argues that the state committed misconduct during its rebuttal argument, in that the state repeatedly overstepped the scope of his closing argument. And there is no doubt that is true—the trial court warned the state no less than four times that the argument was "getting a little far afield of the rebuttal," *see* Apr. 15-16, 2019 Tr. at 1494-95, 1497, 1500-01, 1502, and ultimately sustained Taylor's objection on this point. (Apr. 15-16, 2019 Tr. at 1005.) ("Sustained. You're out of field. Let's wind it up.").

{¶ 10} But as the state notes, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The state correctly observes that the trial court's repeated involvement in the rebuttal argument, and its standard and repeated instruction that closing arguments are not evidence, mitigated any potential prejudicial effect of the state's comments. And even without the trial court's involvement, the state's comments, while argumentative and beyond the scope of Taylor's closing, were not so prejudicial that they denied Taylor's right to a fair trial. Taylor's fifth assignment of error is accordingly overruled.

{¶ 11} Taylor's sixth assignment of error asserts the court erred in its instructions to the jury. During the playing of the video of Detective Doersam's December 12, 2016 interrogation of Taylor, the trial court interrupted the video at timestamp 13:07:45 and stated the following:

> THE COURT: Let me explain something to the jury.
>
> Ladies and gentlemen of the jury, it's constitutionally permissible for police to -- during interrogation to use various tactics. They don't have to be truthful. So when these questions

> are being asked, we don't know whether they're true or not. They're part of the interrogation process. Okay?
>
> Anything on the instruction?
>
> [PROSECUTION]: Not from the State, Your Honor. No, thank you.
>
> THE COURT: Defense?
>
> [DEFENSE]: I probably should preserve an objection for record purposes.
>
> THE COURT: Okay.
>
> [DEFENSE]: Thank you.
>
> THE COURT: Okay, continue on.

(Apr. 12, 2019 Tr. at 1252-53.) The state correctly argues in response that the trial court's description of deception as "part of the interrogation process" is an accurate statement of law. (Apr. 12, 2019 Tr. at 1252.) *See, e.g., In re B.D.*, 2020-Ohio-361, ¶ 32 (10th Dist.) (citing *Oregon v. Elstad*, 470 U.S. 298, 317 (1985), and *State v. Steele*, 2013-Ohio-2470, ¶ 22, and observing that a "number of cases from the United States and Ohio Supreme Courts stand for the proposition that deception is a factor to consider in weighing whether an interrogation was coercive, but that deception, on its own, will not necessarily render a confession involuntary"). Given that the instruction itself is largely correct and, more importantly, that Taylor has not argued on appeal that his statement was involuntary because of police deception, it is not clear how this instruction could establish error on the part of the trial court. Taylor's sixth assignment of error is accordingly overruled.

{¶ 12} In his seventh assignment of error, Taylor argues that his trial counsel was ineffective. To obtain a reversal on appeal for ineffective assistance of counsel, a defendant must demonstrate both that defense counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *See generally Strickland v. Washington*, 466 U.S. 668, 686 (1984). In assessing claims of counsel's deficiency, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). And in evaluating whether the challenged action caused prejudice, this court must find that counsel's error was so serious that there is a reasonable probability it affected the outcome

of the trial. *See, e.g., State v. Bradley*, 42 Ohio St.3d 136 (1989). Here, Taylor asserts his counsel was deficient by failing to request a specific limiting instruction and by ineffectively cross-examining witnesses. He also asserts that the cumulative effect of these instances of deficient performance deprived him of a fair trial.

{¶ 13} Taylor first contends that his attorney should have requested a limiting instruction regarding his pre-trial incarceration, which was brought forth in testimony from two "jailhouse snitches." Jerry Wolford and David Boyd both testified that Taylor made incriminating statements to them while they were all incarcerated at the juvenile detention center, and Taylor argues that his counsel should have requested a limiting instruction that the evidence that he was incarcerated prior to trial was not permitted to be used to infer guilt or that the presumption of evidence was overcome. The state argues that we rejected a similar argument in *State v. Jones*, 2019-Ohio-2134 (10th Dist.):

> [R]eference to the jail calls did not contravene the presumption of innocence. When a defendant is being tried for aggravated murder and other associated violent crimes, it is self-evident that he or she has been arrested. Evidence about a defendant's arrest and ensuing custody does not contravene the presumption of innocence. Moreover, while no specific curative instruction was requested or provided, the trial court fully explained the presumption of innocence in the jury instructions.

*Id.* at ¶ 64, citing *State v. Williams*, 2003-Ohio-4164, ¶ 75. We believe *Jones* and *Williams* control this case. While it would undoubtedly have been appropriate for defense counsel to request and for the trial court to have provided a limiting instruction, the fact that the jury was informed that Taylor was detained prior to trial was mitigated when the trial court fully explained the presumption of innocence in its general instructions. (Apr. 15-16, 2019 Tr. at 1511-12.)

{¶ 14} Taylor next argues that his counsel ineffectively cross-examined witnesses Jerry Wolford, Reynoldsburg Police Sergeant Kevin McDowell, Dasha Taylor, and Reynoldsburg Police Detective Tim Doersam. As to Wolford, Taylor argues his counsel "opened the door" to a redirect question that allowed an inference of guilt; as to McDowell, Taylor argues that his counsel referred in a question to his April 15, 2016 interrogation, which had been suppressed by the trial court (the state objected to the question and the trial court ordered the jury to disregard it); as to Dasha Taylor, Taylor asserts that his

counsel's questioning was incompetent and allowed her to state that it was possible that he left her apartment during the period of the shooting, something she had already ruled out in the state's direct examination; and as to Doersam, Taylor asserts his counsel "opened the door" to an answer that allowed Doersam to refer to Taylor's criminal history, another question that allowed Doersam to answer that he had filed the charges against Taylor (which Taylor asserts bolstered the detective's belief in Taylor's guilt), and that counsel asked a question inviting Doersam to state that he believed Taylor had lied in his statement.

{¶ 15} Although these actions may be somewhat problematic in hindsight, even taken together they do not establish that counsel's performance was both objectively unreasonable and that it was probable, but for that performance, the result of the trial would have been different. *Compare Strickland.* In fact, we do not believe Taylor has shown these decisions to be unreasonable. It was not unreasonable for counsel to believe that he would obtain different answers from Dasha Taylor, given her testimony on direct examination. Nor was it unreasonable for counsel to imply through his questioning of Wolford that Taylor had told Wolford a story about the case based on the discovery Taylor had received. Trial counsel's improper question to McDowell was stricken by the trial court and is not implicated in this analysis, but even so, defense counsel offered a reasonable justification for the question at the time of trial—to elicit testimony that Taylor had cooperated with police by turning over the key fob to his mother's automobile. And counsel's questions to Doersam were justified by his follow-up questions at the time of trial, as an attempt to establish that there was no evidence Taylor was involved in gang activity, to establish that Doersam had not contacted defense counsel prior to charging and interrogating Taylor, and to establish that Taylor's conflicting versions of the facts were given because of his fear of unjust prosecution. Given the strong presumption that counsel's conduct fell within the wide range of professional competence, we cannot conclude that any of this questioning constitutes deficient performance, and we certainly cannot conclude that Taylor was prejudiced by it.

{¶ 16} Finally, Taylor argues that all these instances of alleged deficient performance, when taken all together, constitute prejudice. As support, he cites *State v. DeMarco*, 31 Ohio St.3d 191 (1987), which recognizes the doctrine of cumulative harmless error. But arguing that the cumulative effect of several instances of harmless error is

prejudicial is not at all the same as arguing that the cumulative effect of several instances of alleged deficient performance is prejudicial. Taylor has no support for extending *DeMarco* in this fashion, even if he had shown that any of the instances of alleged deficient performance constituted ineffective assistance of counsel. For all these reasons, Taylor's seventh assignment of error lacks merit and is overruled.

{¶ 17} In his eighth assignment of error, Taylor argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence presented at trial. In *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, the Supreme Court of Ohio stated that regarding sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, *following Jackson v. Virginia*, 443 U.S. 307 (1979). By contrast, determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The jury may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). Therefore, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds, and quoting Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 2014-Ohio-2501, ¶ 22 (10th Dist.), citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 18} Given all the facts we have discussed, we have no doubt that the state presented sufficient evidence to sustain the jury's verdict. Moreover, there is nothing in the record to indicate that the verdict was reached because of passion or prejudice, or was otherwise improper, or that the jury lost its way in reaching the verdict. Accordingly, Taylor's eighth assignment of error is overruled.

{¶ 19} In his ninth assignment of error, Taylor contends his sentence for murder violates the Eighth Amendment to the United States Constitution as cruel and unusual punishment, since he was 17 years old at the time of the shooting. In *State v. Wade*, 2020-Ohio-5399 (10th Dist.), this court affirmed the imposition of a sentence equivalent to a full life term on a defendant who was 16 years old at the time of the homicides in question:

> [*State v.*] *Long*, [2014-Ohio-849], *Miller* [*v. Alabama*, 567 U.S. 460 (2012)], *Montgomery* [*v. Louisiana* 577 U.S. 190 (2016),] and [*State v.*] *Wade*[, 2018-Ohio-976 (10th Dist.)] do not require sentencing courts to reject life sentences for juvenile offenders convicted of homicide; they simply require trial courts to account for the youth of juveniles as a mitigating factor when sentencing for murder. Here, the trial court specifically stated that it had evaluated the defendant's youth and determined that an effective life without parole sentence of 172 1/2 years to life was appropriate punishment. We do not believe that caselaw required the trial court to do more than that, even if it would be a better practice to do so. Accordingly, we conclude that the trial court did not err in its sentence, and that Wade's rights under the U. S. Constitution and the Ohio Constitution to be free of cruel and unusual punishment were not violated.

*Wade*, 2020-Ohio-5399, at ¶ 8.

{¶ 20} Taylor argues that the same principles enunciated in *Montgomery v. Louisiana*, 577 U.S. 190 (2016) and *Miller v. Alabama*, 567 U.S. 460, 465 (2012) that we reviewed in *Wade* apply to preclude "automatically sentencing a juvenile like Taylor to 15 years to life," and contends that this constitutes plain error under Crim.R. 52(B). (Appellant's Brief at 60.) But Taylor does not argue that the trial court failed to consider his youth in sentencing him and, more importantly, Taylor is automatically ineligible for parole. The lack of that eligibility for parole is the crucial flaw upon which *Montgomery* and *Miller* turn, and that flaw is simply not present in Taylor's case. Accordingly, Taylor's Eighth Amendment argument lacks merit, and therefore his ninth assignment of error must be overruled.

{¶ 21} For all the foregoing reasons, Taylor's six remaining assignments of error are overruled.  For the reasons stated herein and for the reasons stated in *State v. Taylor*, 2024-Ohio-1752, the judgment of the Franklin County Court of Common Pleas in this cause is affirmed.

*Judgment affirmed.*

DORRIAN and MENTEL, JJ., concur.

———————————