[Cite as *State v. Taylor*, 2022-Ohio-2877.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

    Plaintiff-Appellee,              :

                               No. 19AP-396
v.                                             :         (C.P.C. No. 17CR-3590)

Damon L. Taylor,                               :         (REGULAR CALENDAR)

    Defendant-Appellant.             :

---

D E C I S I O N

Rendered on August 18, 2022

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

**On brief:** *Carpenter Lipps & Leland, LLP, Kort Gatterdam*, and *Erik P. Henry*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Damon L. Taylor, appeals the judgment of the Franklin County Court of Common Pleas following a juvenile bindover and a jury trial. The jury found him guilty of murder with firearm specification and the court sentenced him to a 15-years-to-life term, consecutive to a three-year term for the specification. Taylor asserts nine assignments of error with the trial court's judgment:

> [I.] Mandatory bindovers under R.C. 2152.12(A)(1)(a)(i) violate due process and equal protection rights guaranteed under the United States and Ohio Constitutions.
>
> [II.] The juvenile court erred by finding probable cause, on a complicity theory, existed to transfer this matter to adult court in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

[III.] The trial court erred in denying appellant's motion to suppress statements.

[IV.] The trial court abused its discretion by allowing testimony regarding Snapchat from a witness when there was a lack of foundation and lack of qualification of the testifying witness contrary to the Due Process Clause of the Ohio and United States Constitutions.

[V.] The prosecutor engaged in misconduct during closing argument resulting in a denial of appellant's right to Due Process.

[VI.] The trial court erred in providing a limiting instruction regarding law enforcement's interrogation tactics.

[VII.] Appellant was deprived of the effective assistance of trial counsel in violation of appellant's rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Section 10 and 16, Article I of the Ohio Constitution.

[VIII.] The trial court violated appellant's rights to due process and a fair trial when it entered a judgment of conviction based on insufficient evidence and against the manifest weight of the evidence in violation of appellant's rights under the United States and Ohio Constitutions.

[IX.] The imposition of an indefinite prison sentence of 15 years to life for murder violated the Eighth Amendment to the United States Constitution.

{¶ 2} Plaintiff-appellee, State of Ohio, alleged that on April 15, 2016, Taylor shot and killed Enrique Straughter. The facts at trial indicated that late in the evening of April 14, 2016, Taylor either stole or borrowed his mother's car, which happened to contain his stepfather Michael Jackson's firearm, a Smith & Wesson MP40 semiautomatic pistol. Taylor met up with his friend (and his sister Dasha's boyfriend) Damion Wade, went to the home of his two sisters Dasha and Asha on Commons Road, and drank and smoked marijuana with Wade and Asha. At some point Taylor became agitated about the loss of a chain that he owned and apparently believed that it had been stolen by Straughter, whom he had considered a friend. Straughter lived in the same apartment complex as Dasha and Asha, on Lavenham Road, which is well within walking distance of Commons Road.

{¶ 3}   Shortly after midnight on April 15, 2016, Reynoldsburg police were called to Lavenham on report of a shooting.  They discovered Straughter on the ground with gunshot wounds, at the time still alive and struggling to breathe.  He was pronounced dead shortly thereafter.  Crime scene investigators examining the immediate area found three .40 caliber shell casings, four unfired .40 caliber bullets, a broken pistol slide rail, two red Nike Jordan sandals, and an electronic Chevrolet key fob.  (*See* State's Ex. B to Bindover Hearing.)  The key fob triggered the locks of a Chevy Malibu awkwardly parked about 200 feet away.  The car belonged to Taylor's mother, who reported the car stolen at approximately 3:30 a.m. on April 15, 2016 and also reported Taylor himself as missing since 11:45 the prior evening.  She apparently followed up with the police to report that  Taylor had not reported to school on April 15 either.

{¶ 4}   Based on this evidence, Reynoldsburg police obtained a search warrant for the apartment belonging to Taylor's two sisters.  When they arrived at the apartment to execute the warrant, Taylor was there.  It is unclear whether Taylor was arrested before or during the search of the apartment, but notwithstanding, police seized several cell phones from the apartment, one of which tied to a Bluetooth device and identified as "Damon Taylor."  Police were eventually able to extract several Snapchat photos from this phone—one the photos, time-stamped on April 14, 2016 at 11:33 p.m., shows a hand holding a Smith & Wesson pistol inside a Chevrolet, and another photo, taken at 10:55 a.m. on April 15 depicts Taylor laying back on a couch with his hand across his chest, and is captioned: "They tryna take me for murda."  (State's Ex. C2 and C4 to Bindover Hearing.) Police were also able to extract messages from the phone, which depicted the following conversation:

> ME: I'm not on god I left my gun in the car and someone shot some one with it and took off in the whip I go see a lawyer in like 30 mij
>
> OFF: Why do you have a gun
>
> ME: It was my stepdads he left it in the car and then I left the doors unlock
>
> And got high fell asleep woke up to some bad news

(State's Ex. C3 to Bindover Hearing.)  Subsequent DNA tests on the gun rail were found to contain a two-person DNA mixture, and the major contributor was identified as Straughter, while the minor contributor was identified as Taylor.  (Apr. 12, 2019 Tr. at 1085.)

{¶ 5}  After he was arrested, Taylor was taken to the police station for interrogation. (State's Ex. B to Mar. 15, 2018 Mot. Hearing; *see also* State's Ex. C(1) to Mar. 15, 2018 Mot. Hearing at 14:14 et seq.)  A video of the encounter demonstrates some discussion prior to Taylor being provided any *Miranda* warnings about him being named as a missing person and a suspect in the auto theft, and also that he is a person of interest in a homicide.  Taylor, then a minor, requests to call his mother and his stepfather.  He also seems to dispute any knowledge of where the automobile is parked, although the video is not clear on this point. The video does clearly demonstrate that two police officers told Taylor that he was a murder suspect and that they had witnesses to that effect.

{¶ 6}  Prior to providing Taylor any *Miranda* warnings, the officers tell him that they would like to hear "his side of the story" while it's "fresh in his mind."  Taylor states that he is willing to talk to them about what happened the prior night and that he did not care about witnesses, but also that "I already talked to my lawyer."  Subsequently, Reynoldsburg Police Detective Tim Doersam begins to read the *Miranda* form to Taylor, who agrees that he understands all of them, but then repeatedly states that he wants his lawyer to be present.  Detective Doersam then goes back to the top of the form to fill in his identifying information.  Taylor repeatedly indicates that he will not talk without a lawyer. Detective Doersam and the other officer push him to talk even after he says he's not going to talk without his lawyer present, and suggest that Taylor's mother might get charged with some offense.  After they indicate on the *Miranda* form that Taylor refuses to talk to them without an attorney present, they seek and obtain his consent for a DNA swab, test him for gunshot residue, and continue to encourage him to talk to them and ask him questions about the case.  Taylor engages with them somewhat but is consistent about his desire to talk to his attorney and also his mother and is largely silent.  After approximately one and one-half hours the video ends, and Taylor is told that his lawyer had arrived and was coming in.  The trial court found that shortly thereafter, "counsel advised the detectives that Defendant would not consent to be interviewed, and ultimately, Defendant was released to his counsel.  Over the next eight months, police continued to investigate Mr. Straughter's

death.  During that time, Defendant's counsel advised both the detectives and the Assistant Prosecuting Attorney that Defendant would not consent to an interview or proffer."  (Nov. 05, 2018 Order & Entry at 4.)

{¶ 7}   But on December 12, 2016, charges were filed against Taylor, he was again arrested, and was again interrogated by Detective Doersam.  This interrogation was also videotaped, and when Detective Doersam went over the *Miranda* rights form this time, Taylor signed the waiver and talked with the police.  (State's Ex. E to Mar. 15, 2018 Mot. Hearing; *see also* State's Ex. C(2) to Mar. 15, 2018 Mot. Hearing at 11:25:15 et seq.)  Taylor filed a motion to suppress evidence, and at a motion hearing Detective Doersam admitted that after April 15, 2016, he was aware that Taylor was represented by an attorney and that he had subsequent contacts with that attorney, but claimed that when Taylor was arrested on December 12, 2016, he did "not a hundred percent" know that the attorney he had been dealing with was still representing Taylor on that date.  (Mar. 14 and 15, 2018 Tr. at 36.)  He admitted that he knew that Taylor's attorney had been "actively involved in the case," *id.* at 78, that the prosecutor had previously reached out to Taylor's attorney to request that Taylor give a statement about the case to the prosecutor and Detective Doersam, *id.*, that he had a meeting with the prosecutor's office in December prior to filing the charges against Taylor, *id.* at 79, that at the time the charges were approved by the prosecutor and filed, he knew Taylor's attorney "had represented him up until the last time I talked to you," *id.* at 80, and that no one had ever communicated to him that Taylor was no longer represented by his attorney, *id* at 81.  Finally, Detective Doersam admitted that he made no attempt to contact Taylor's attorney:

> [Dodgion]: Okay. You didn't contact me, correct?
>
> [Detective Doersam]: Correct.
>
> Q: You didn't make an attempt to contact me, correct?
>
> A: Correct.
>
> Q: Mr. -- As far as you know, nobody from the county prosecutor's made an attempt to contact me, correct?
>
> A: Correct.
>
> Q: And on your direct examination, you kind of intimated or implied that, eh, at that point in time I really didn't know who

was representing him or whether or not Mr. Dodgion was representing him, didn't you, yesterday?

A: I said I could not be a hundred percent at that point.

Q: Okay. Fair enough. That was your answer. But, again, nobody had told you differently, right?

A: Correct.

Q: Okay. And you didn't even ask Damon Taylor whether or not I was still representing him, did you?

A: I don't believe so.

Q: And that's because you didn't want the answer, right?

A: It's because it's his decision.

Q: But you didn't ask because you didn't want the answer, correct?

A: I don't -- I didn't -- more because I don't think the decision mattered -- or the answer didn't matter that much.

Q: It didn't matter. So if you would have asked him, hey, you know, we got you down here, we know that Mr. Dodgion was representing you in the past and up 'til a month or so ago. Is he still representing you, by the way? You know that if he'd -- if you'd asked that question and he answered, yes, Mr. Dodgion is representing me everything stops, right?

A: I -- Not -- No.

(Mar. 14 and 15, 2018 Tr. at 84-85.)

{¶ 8} Because Taylor was a juvenile at that time Straughter was killed, the case was filed in juvenile court as a mandatory bindover offense. But on December 22, 2016, the Supreme Court of Ohio issued *State v. Aalim*, 150 Ohio St.3d 463, 2016-Ohio-8278 ("*Aalim I*"), and held Ohio's mandatory bindover statute to be unconstitutional. A probable cause hearing commenced in juvenile court and on April 28, 2017, that juvenile court found there was probable cause to bind Taylor over for the crime of complicity to murder with specification. Then, on May 25, 2017, the Supreme Court reconsidered *Aalim I*, reversed its earlier decision, and determined that Ohio's mandatory bindover statute was constitutional. *See State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956 ("*Aalim II*").

Subsequently, in accordance with *Aalim II* the juvenile court transferred jurisdiction of the case to the general division without proceeding to an amenability determination.

{¶ 9} Because it had found that there was conflicting evidence about whether Taylor or Wade shot Straughter, when the juvenile court relinquished jurisdiction over the case it found probable cause for complicity rather than purposeful murder. Notwithstanding this ruling, on June 30, 2017 Taylor was indicted by the General Division of the Franklin County Court of Common Pleas for aggravated murder, purposeful murder, and felony murder by felonious assault, each with a three-year gun specification. Following a trial, Taylor was found guilty by a jury of felony murder by felonious assault with gun specification, and was found not guilty of the two other charges and specifications. On May 28, 2019, the trial court sentenced Taylor to 15 years to life plus 3 mandatory and consecutive years on the gun specification, for an aggregate sentence of 18 years to life.

{¶ 10} In his first assignment of error, Taylor claims the Ohio mandatory-bindover procedures in Ohio do not satisfy either procedural or substantive due process under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), and *United States v. Kent*, 383 U.S. 541, 557-61 (1966). But the argument presented in this assignment of error has already been rejected by the Supreme Court, *see Aalim II*, and Taylor admits in his brief that he "raises this issue in order to preserve it for further review." (Appellant's Brief at 17.)

{¶ 11} The only difference between this case and *Aalim II* is that this case commenced after the release of the *Aalim I* opinion, but before the Supreme Court granted reconsideration, vacated *Aalim I*, and issued *Aalim II*. At the time the probable cause hearing was held in juvenile court *Aalim II* had not yet been decided, and the juvenile court was operating under discretionary bindover proceedings in accordance with *Aalim I*. Taylor argues that because the probable cause phase of his case was held and decided pursuant to *Aalim I* that the intervening decision in *Aalim II* finding the mandatory bindover statute to be constitutional does not apply to his case.

{¶ 12} We disagree. Until the Supreme Court issues a mandate in the underlying case, its decisions are subject to review and revision. *See* S.Ct.Prac.R. 18.04(A). Here, the mandate did not issue until ten days after the Court issued *Aalim II*. *See* case No. 2015-0677, https://www.supremecourt.ohio.gov/Clerk/ecms/#/caseinfo/2015/0677. *See also* Painter and Pollis, *Ohio Appellate Practice*, Section 8:53 ("If a motion for reconsideration

is filed and granted, the mandate issues 10 days after entry of the ultimate judgment."). This court has previously observed that the "controlling date" of aSupreme Court decision "is that upon which the Supreme Court issued its mandate to the lower court." *State v. Mackert*, 10th Dist. No. 77AP-922 (May 23, 1978), 1978 Ohio App. LEXIS 10611 *2, citing *State v. Watson*, 48 Ohio App.2d 110 (6th Dist.1975). Moreover, "[t]he general rule is that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former was bad law, but that it never was the law." *Peerless Elec. Co. v. Bowers*, 164 Ohio St. 209, 210 (1955). For these reasons, the juvenile court's determination that *Aalim II* controlled the decision to relinquish jurisdiction was correct, and Taylor's first assignment of error must be overruled.[1]

{¶ 13} In Taylor's second assignment of error, he challenges the merits of the juvenile court's bindover decision. In *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, the Supreme Court reviewed the statute and caselaw regarding the standard of review for juvenile court probable-cause determinations, and concluded that "a juvenile court's probable-cause determination in a mandatory-bindover proceeding involves questions of both fact and law, and thus, we defer to the trial court's determinations regarding witness credibility, but we review de novo the legal conclusion whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged," *id*. at ¶ 51, and observed that the state " 'must provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the juvenile committed the offense before ordering mandatory waiver of juvenile court jurisdiction * * * [it] must produce evidence that raises more than a mere suspicion of guilt, but *need not* provide evidence proving guilt beyond a reasonable doubt.' " (Emphasis sic.) *Id*. at ¶ 42, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93 (2001).

---

[1] We are mindful of the fact that on April 12, 2022, the Supreme Court heard oral argument on a proposition of law asserting that *Aalim II* was wrongly decided and must be overruled. *See generally*, case No. 2021-0579, *State v. Bunch*, https://www.supremecourt.ohio.gov/Clerk/ecms/#/caseinfo/2021/0579 and Brief of Appellant at 22 (stating Proposition of Law No. II, "A child cannot be transferred to adult court without a finding that they are not amenable to treatment in juvenile court.") https://www.supremecourt.ohio.gov/pdf_viewer/pdf_viewer.aspx?pdf=910526.pdf&subdirectory=2021-0579\DocketItems&source=DL_Clerk. The case is currently awaiting decision, and unless and until the Court issues a decision in that case adopting that proposition of law, *Aalim II* remains controlling law regarding Taylor's first assignment of error.

{¶ 14} Taylor argues that there was insufficient evidence presented at the bindover hearing to establish he was complicit to the purposeful murder of Straughter. The juvenile court did not find that there was sufficient evidence to establish that Taylor actually pulled the trigger and shot Straughter, but did find that the gun belonged to Taylor's stepfather, that Taylor had held the gun less than an hour before the murder occurred, and that Taylor was found in the vicinity of the murder shortly after it occurred.[2] Taylor argues the juvenile court erred in finding probable cause that he was complicit in the murder of Straughter, and argues that "[i]f there was a plan to rob and/or shoot Straughter, there is no evidence Taylor was part of it." (Appellant's Brief at 25.)

{¶ 15} But probable cause is a low and flexible standard, and the fact that Taylor had possession of both the gun and the motor vehicle used in Straughter's death immediately prior to the shooting, as well as his continued presence in the vicinity of the shooting is certainly evidence of Taylor's complicity to the crime. Moreover, Taylor admitted during his December 12, 2016 interrogation to believing that a shootout would happen that evening because Straughter possessed a gun, implying that he had some foreknowledge of a plan to confront Straughter. It is unnecessary for the state to prove its case beyond a reasonable doubt at this stage of the proceedings, *see, e.g., In re D.M,* 140 Ohio St.3d 309, 2014-Ohio-3628, ¶ 10, and the record establishes the trial court correctly concluded that the state presented probable cause sufficient to show Taylor's complicity to Straughter's murder.

{¶ 16} And in a different case, this conclusion might end our inquiry into Taylor's second assignment of error. But on February 3, 2022, the Supreme Court of Ohio issued the decision in *State v. Smith*, ___ Ohio St.3d ___, 2022-Ohio-274, which complicates our analysis of the probable-cause question. Accordingly, we ordered the parties to submit post-argument supplemental briefing specifically on *Smith* and its application to the pending case.

{¶ 17} R.C. 2152.02 requires mandatory bindover and transfer of jurisdiction of "the act charged" if there is a finding of probable cause on that act. Subsection A of the statute

---

[2] Evidence used at the probable cause hearing included Detective Doersam's testimony summarizing the statements made by Taylor during the December 12, 2016 interrogation challenged in his third assignment of error. During that interrogation, Taylor admitted that he was present and saw Wade shoot Straughter. Taylor does not challenge the use of those statements under this assignment of error; instead, he relies on them in his argument. (Appellant's Brief at 25.)

defines the "act charged" as "the act that is identified in a complaint, indictment, or information alleging that a child is a delinquent child."  In *Smith*, the court concluded that based on R.C. 2152.02(A), "a juvenile court may transfer a case or a matter to adult court, but *the adult court's jurisdiction is limited to the acts charged for which probable cause was found*."  (Emphasis added.)  *Id.* at ¶ 29.  The court therefore held that "[i]n the absence of a juvenile court's finding probable cause * * * no adult court has jurisdiction over acts that were charged in but not bound over by the juvenile court."  *Id.* at ¶ 44.

{¶ 18}  *Smith*'s interpretation of R.C. 2152.02 is rooted in the historical understanding and policy upon which juvenile court jurisdiction in Ohio is based.  As Ohio courts have repeatedly recognized, "the very purpose of the state juvenile code is to avoid treatment of youngsters as criminals and insulate them from the reputation and answerability of criminals."  (Internal quotations omitted.)  *Smith* at ¶ 2, quoting *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, ¶ 19, and *In re Agler*, 19 Ohio St.2d 70, 80 (1969).  For this reason, the juvenile statutes are to be "liberally interpreted and construed so as to * * * provide judicial procedures through which Chapters 2151 and 2152 of the Revised Code are executed and enforced, and in which the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced." R.C. 2151.01(B) (quoted in *Smith* at ¶ 19).  Moreover, in interpreting and applying the juvenile court statutes, courts have consistently construed those statutes in favor of the due process rights of juveniles and the jurisdiction of juvenile courts.  *See Agler* at 72, citing *Prescott v. State*, 19 Ohio St. 184 (1869); *State v. Worden*, 162 Ohio St. 593, 596 (1955) (observing that since 1931, Ohio statutes have granted exclusive jurisdiction with respect to felony charges against minors with the juvenile court); *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, syllabus (waiver of right to amenability hearing in discretionary bindover must be express and on record following colloquy and inquiry by court); *In re M.P.*, 124 Ohio St.3d 455, 2010-Ohio-599, syllabus (denial of a motion for discretionary bindover based on amenability to treatment is not appealable by the state); *State v. Wilson*, 73 Ohio St.3d 40 (1995), syllabus (absent a proper bindover procedure  juvenile court has exclusive subject-matter jurisdiction over any case concerning a child alleged to be a delinquent and subject-matter jurisdiction cannot be waived); *Iacona*, 93 Ohio St.3d 83, paragraphs one and three of the syllabus (holding that the state has a duty "to disclose to a juvenile respondent all evidence in the state's possession favorable to the juvenile respondent and material either to guilt or

punishment that is known at the time of a mandatory bindover hearing" and that it "must provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the juvenile committed the offense before ordering mandatory waiver of juvenile court jurisdiction"); *D.M.*, 2014-Ohio-3628, ¶ 2 (holding that Juv.R. 24 applies to bindover hearings and that the court must hold an in camera inspection to determine whether disputed evidence is discoverable under the rule); and *State v. Hanning*, 89 Ohio St.3d 86 (2000) (restricting application of complicity statute in bindover proceedings where the legislature has not provided for such use).

{¶ 19}   Mindful of this jurisprudential background, we must consider how *Smith*'s dictate that "no adult court has jurisdiction over acts that were charged in but not bound over by the juvenile court" applies to the juvenile court's bindover order in this case.  *Id*. at ¶ 44. Here, the "act charged" in Taylor's juvenile complaint was purposeful murder in violation of R.C. 2903.02(A), *see In re Taylor*, Franklin C.P. No. 16JU-14766 (Dec. 12, 2016 Compl.), but the juvenile court specifically found only "probable cause to believe that the Child committed * * * COMPLICITY TO MURDER in violation of Section 2923.03(A) as it relates to Section 2903.02(A)."  *In re Taylor*, Franklin C.P. No. 16JU-14766 (June 8, 2017 Entry Sustaining State of Ohio's Mot. to Relinquish Jurisdiction Filed December 13, 2016 at 1.).   And while under R.C. 2923.03(F), "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense," Taylor's indictment in the general division stated all of the alleged offenses (including his eventual offense of conviction) without reference to complicity.   His indictment simply charges him with aggravated murder in violation of R.C. 2903.01, purposeful murder under R.C. 2903.02(A), and felony murder by felonious assault under R.C. 2903.02(B).  *See State v. Taylor*, Franklin C.P. No. 17CR-3590 (June 30, 2017 Indictment.).   And as stated above, Taylor was ultimately found guilty of felony murder as a principal offender rather than as a complicitor.  (June 24, 2019 Am. Jgmt. Entry at 1.)  Accordingly, as it relates to this case, the question presented by *Smith* is whether complicity to purposeful murder under R.C. 2903.02(A) is an equivalent "act charged" to felony murder by felonious assault under R.C. 2903.02(B).

{¶ 20} Although *State v. Hanning*, 89 Ohio St.3d 86 (2000), interpreted and applied a version of the bindover statute that has since been superseded and restructured, it is instructive to the resolution of this question.  In *Hanning*, the 17-year-old defendant

was charged as a juvenile with delinquency by aggravated robbery. Hanning was armed with a pellet gun, but his codefendant was armed with a handgun. The state filed a motion for mandatory transfer of Hanning for prosecution as an adult, arguing both that he was subject to transfer because under a R.C. 2923.03 complicity theory he qualified as a " 'child [that] is alleged to have had a firearm *on or about the child's person* or *under the child's control* while committing the act charged *and* * * * used the firearm to facilitate the commission of the act charged' " pursuant to former R.C. 2151.26(B)(4)(b), *see id.* at 91, (emphasis sic) and also that because "if the charge of a certain offense would trigger the mandatory bindover provision of [former] R.C. 2151.26, then the charge of complicity in that offense, pursuant to R.C. 2923.03, also triggers the mandatory bindover provision." *Id.* at 92. Hanning was bound over, indicted, tried and convicted in adult court, but on appeal this court reversed. *See generally State v. Hanning*, 10th Dist. No. 98AP-380 (Feb. 9, 1999) 1999 Ohio App. LEXIS 400.

{¶ 21} And on appeal by the state, the Supreme Court affirmed our judgment. Analyzing both arguments, the court first held that the plain language of former R.C. 2151.26(B)(4)(b) "does not provide that a child can be bound over based on the fact that a firearm was used by an accomplice," *Hanning*, 89 Ohio St.3d at 91. But the court also went on to hold that "the complicity statute, R.C. 2923.03, does not apply to the juvenile bindover criteria set forth in [former] R.C. 2151.26." *Id.* at 94. The court observed:

> To require bindover for a child based on an adult accomplice's decision to use a firearm through application of the complicity statute runs contrary not only to the doctrine of *parens patriae*, upon which the General Assembly built the juvenile criminal justice system, but to common sense.
>
> Our holding does not allow Hanning or other juveniles to escape responsibility for their own actions. We merely find that *the legislature did not intend to automatically attribute responsibility to the juvenile for the actions of his or her accomplice* * * *. Juveniles in Hanning's situation are still subject to transfer to adult court under [former] R.C. 2151.26(C), which provides that a child who commits a felony can be bound over if he is fourteen years of age or older and the results of an investigation and hearing indicate reasonable grounds to believe that the child is not amenable to care or rehabilitation in the juvenile system and the safety of the community requires that the child be placed under legal

> restraint, including, if necessary, for a period extending beyond the child's majority.

(Emphasis added).[3] *Id.* at 93.

{¶ 22} The existence of juvenile court is premised on the legislature's public policy judgments that children have a far greater need for protection and a far greater capacity for redemption than adults.

> Juvenile courts hold a unique place in our legal system. They are legislative creatures that eschewed traditional, objective criminal standards and retributive notions of justice * * *. The overriding purposes for juvenile dispositions are to provide for the care, protection, and mental and physical development of children subject to [R.C. Chapter 2152], protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender. R.C. 2152.01(A).

> *We should respect those stated statutory purposes when examining, applying, and, when necessary, interpreting the statutes for juvenile bindovers for prosecution in adult court.* This bindover process is based first on the juvenile court's finding of probable cause to believe that the child committed the act charged. A juvenile court's finding of probable cause and subsequent bindover of the child are not an open invitation for the adult court to treat the child as if his or her bindover to adult court is the child's first encounter with a tribunal for the acts named in the bindover order—there are limitations. Juvenile bindover does not open the door to prosecution in adult court for any charge the state might later seek in an indictment.

---

[3] We are mindful that *Hanning* concerned bindover for a "category two" offense, which under both former and current statutes mandated bindover for a 16 year old only when the alleged delinquent had already been committed to the custody of the department of youth services for a prior offense or the alleged delinquent used a firearm in the commission of the offense. As such, it does not directly control Taylor's case, since murder is a "category one" offense with no such qualifiers for bindover. *Compare* former R.C. 2151.26 *with* R.C. 2152.02(AA) and (BB), 2152.10(A), and 2152(A)(1)(a). But we believe that *Smith's* holding that "the adult court's jurisdiction is limited to the acts charged for which probable cause was found," *Smith*, 2022-Ohio-274 at ¶ 29, complements and reinforces *Hanning's* core holding that "the complicity statute, R.C. 2923.03, does not apply to the juvenile bindover criteria set forth in [the bindover statutes]." *Hanning*, 89 Ohio St.3d 86, paragraph two of the syllabus. Both rules rest upon and clearly demonstrate the principle that bindover is a narrow exception to be construed strictly against transfer out of the juvenile court's parens patriae jurisdiction. *See Smith* at ¶ 1-2 and *Hanning* at 88-89. And the legislature approves of this understanding the juvenile court's statutory jurisdiction—since *Hanning* was issued, the legislature has amended the bindover statute several times (and has in fact recodified the entire juvenile code), but it has taken no steps to supersede or modify *Hanning's* holding.

(Internal citations and quotations omitted, emphasis added.) *Smith* at ¶ 2. Pursuant to *Smith* and in furtherance of the legislative purposes set forth in R.C. Chapter 2152, we conclude that complicity to purposeful murder under R.C. 2903.02(A) is not an equivalent "act charged" to felony murder by felonious assault under R.C. 2903.02(B) for purposes of transferring jurisdiction of Taylor from the juvenile division to the general division of the Franklin County Court of Common Pleas. Accordingly, we sustain Taylor's second assignment of error. The judgment of the common pleas court is vacated, and this case is returned to the juvenile court for further consideration.

{¶ 23} Taylor's third assignment of error asserts that his rights under the Fifth and Sixth Amendments to the United States Constitution were violated when he was interrogated on December 12, 2016. He contends that all statements he made while in police custody on December 12, 2016, and evidence obtained as a result of his statements must be suppressed because he had invoked his Fifth and Sixth Amendment rights when he was initially arrested on April 15, 2016.

{¶ 24} Taylor argues that subsequent to his April 15 arrest and invocation of right to counsel, his attorney advised the Assistant Prosecuting Attorney and detectives that Taylor intended to continually invoke said rights. The state does not contest the fact that Taylor invoked his right to counsel after his April arrest, but instead directs the court to defendant's statement of *Miranda* rights and waiver form executed on December 12, 2016, in which Taylor purportedly waives his Fifth and Sixth Amendment rights. The state further points to the recording of the December 12, 2016 interview in which Taylor was read his *Miranda* rights, and neither requested counsel nor exercised his right to remain silent. On consideration of Taylor's motion to suppress, the trial court ruled as follows:

> This Court has reviewed the recordings of both the April 15, 2016 and December 12, 2016 interviews - multiple times - together with both Statement of Miranda Rights and Waiver Forms, the testimony received at the hearing, and the arguments of counsel. In doing so, the Court noted the passage of time between interview[s] within which Defendant reached the age of majority; Defendant's ability to invoke his rights in April 2016; Defendant's demeanor; Defendant's responses and voluntary communications; as well as police conduct. In consideration of these factors, the Court reaches the conclusion that under the totality of the circumstances, Defendant knowingly and voluntarily executed the Statement of Miranda

Rights and Waiver Form on December 12, 2016. As a result of such waiver, Defendant's statements made at the December 12, 2016 interview are admissible, and Defendant's motion to suppress with respect thereto is **DENIED**.

(Emphasis sic.)  (Nov. 05, 2018 Order & Entry at 12-13.)

{¶ 25} Our review of the record demonstrates that both Taylor's trial counsel and the trial prosecutor believed this case was controlled by *Edwards v. Arizona*, 451 U.S. 477 (1981), and *Maryland v. Shatzer*, 559 U.S. 98 (2010), which involve assertion of the right to have counsel present during custodial interrogation and a subsequent resumption of questioning following a break in custody.  And although not cited in its entry, the fact that the court used the "knowing and voluntary waiver" standard set forth in *Edwards* and *Shatzer* reveals that the trial judge also relied upon those cases to deny Taylor's motion to suppress.

{¶ 26} We believe the trial court correctly concluded that *Edwards* and *Shatzer* control the Fifth Amendment half of this situation.  *Edwards* creates a second-level prophylactic rule following *Miranda v. Arizona*, 384 U.S. 436 (1966) that during custodial interrogation following *Miranda* warnings, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  *Edwards v. Arizona*, 451 U.S. at 484. The right to have counsel present under these circumstances is rooted in the Fifth Amendment, not the Sixth.  *Id*. at 482  ("*Miranda* thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation.").  *Shatzer*, in turn, creates a third-level bright-line rule that *Edwards*'s Fifth Amendment "presumption of involuntariness" does not apply if there has been a break in custody of 14 days.  *Maryland v. Shatzer*, 559 U.S. at 110  ("We think it appropriate to specify a period of time to avoid the consequence that continuation of the *Edwards* presumption 'will not reach the correct result most of the time.' It seems to us that period is 14 days.  That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody.").  (Internal citations omitted.)  Taylor was out of custody between April 15 and December 12, 2016, and under *Shatzer* that extended break rendered the *Edwards*

presumption of involuntariness inapplicable to his custodial interrogation. Accordingly, the trial court correctly determined that Taylor was able to knowingly and voluntarily waive his Fifth Amendment right to counsel.

{¶ 27} But *Miranda*, *Edwards*, and *Shatzer* have only tangential application to the Sixth Amendment right to counsel analysis *once an adversarial proceeding for a specific offense has commenced.*[4]  *See, e.g., Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). *Montejo* held that a defendant who stood mute at his initial appearance at the time he was appointed counsel had not ipso facto asserted his right to counsel for purposes of the Sixth Amendment bar on interrogation by the state simply because counsel had been appointed. The *Montejo* court set forth certain bedrock principles as to how the Sixth Amendment right to counsel operates:

> Under our precedents, once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. Interrogation by the State is such a stage.
>
> Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment * * *.
>
> The *only* question raised by this case, and the only one addressed by the *Jackson* [475 U.S. 625 (1986)] rule, is whether courts must *presume* that such a waiver is invalid under certain circumstances.

(Citations omitted, emphasis sic.)  *Id.* at 786-87.  *Montejo* overruled *Michigan v. Jackson*, 475 U.S. 625 (1986), which had created a prophylactic rule forbidding police from interrogating defendants who had requested counsel but had not yet consulted with counsel.  The defendant in *Montejo*, like the defendant in *Jackson*, had been appointed

---

[4] In *Edwards* and *Shatzer*, no critical stage in the adversarial process against the defendants had yet commenced—the second interview with Shatzer was purely investigatory and no charges were pending, and the second interview with Edwards occurred prior to his indictment.

counsel but had not yet been afforded the opportunity to consult with counsel. *Montejo* held that defendants who had not yet consulted with counsel could still validly waive their rights to counsel following *Miranda* warnings.

**{¶ 28}** Taylor's situation at the time of his December 12, 2016 interrogation was quite different—not only had he already consulted with counsel, representatives of the state had recognized and repeatedly dealt with that counsel, including the detective who interrogated Taylor. Notwithstanding those differences, the Sixth Amendment as described in *Montejo* controls this situation, and under that framework the analysis of Taylor's Sixth Amendment claim is as follows: first, had his Sixth Amendment right to counsel attached when he was arrested and interrogated on December 12, 2016; second, did he assert those rights prior to the interrogation; and third, was his *Miranda* waiver effective to knowingly, voluntarily, and intelligently waive his right the counsel?

**{¶ 29}** In juvenile cases, the adversarial proceeding generally commences not by the issuance of an indictment, but simply by the issuance of complaint.[5] And *Montejo*

---

[5] It is apparently for this reason that the state has argued to this court that Taylor's interrogation on December 12 preceded the filing of the complaint against him. (Appellee's Brief at 33.) Detective Doersam's testimony at the suppression hearing and his statements on the video of the interrogation both indicate that the charges were filed prior to 11:16 a.m. on December 12, 2016. (Mar. 14 and 15, 2018 Tr. of Suppression Hearing at 32, 79-80.) But the electronic time-stamp on the complaint indicates it was not filed until 9:21 p.m. that day, and the state therefore argues that Taylor's Sixth Amendment rights did not attach until after he was arrested and interrogated on December 12, 2016.

The state's argument on this point is spurious—if the complaint had not already been approved and filed at the time Taylor was arrested and interrogated, both the arrest and the interrogation would have been improper under R.C. Chapter 2935:

> Juv.R. 6 specifies the circumstances under which a child may be taken into custody. The only circumstance applicable herein is "pursuant to the law of arrest." Although the record does not affirmatively indicate, apparently the arrest was without a warrant, since there is no record of an order of the court that defendant be taken into custody, which necessarily would have been preceded by the filing of a complaint, and, accordingly, R.C. 2935.05 is applicable. That section requires the filing of an affidavit describing the offense for which the person was arrested, either with the court or with the prosecuting attorney. If filed with the attorney, he must forthwith file a complaint with the court based on the affidavit. Both R.C. 2935.03 and 2935.04 permit detention of a person arrested without a warrant only until a warrant can be obtained, which, pursuant to R.C. 2935.08, is to be issued forthwith upon the filing of the affidavit or complaint in accordance with R.C. 2935.05.

*In re Therklidsen*, 54 Ohio App.2d 195, 197 (10th Dist.1977). *See also State v. Maurer*, 15 Ohio St.2d 239, 255 (1984), and *Brown v. Illinois*, 422 U.S. 590 (1975) (holding that *Miranda* warnings do not purge the taint of an illegal arrest and that statements obtained as a result of that arrest may be suppressed as fruit of the poisonous tree). The state cannot now claim that it is *entitled* to evade the requirements of the Constitution because it failed to perform its duty and thereby arrested and interrogated a defendant without statutory authority—the very idea turns due process upside down.

recognizes that "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings [and] Interrogation by the State is such a stage." *Montejo*, 556 U.S. at 786. Here, Detective Doersam's testimony at the suppression hearing and his statements to Taylor during the interrogation demonstrate that the very latest point in time at which the state could be deemed to have initiated adversarial proceedings against Taylor was when it arrested and interrogated him that morning. (Mar. 14 and 15, 2018 Tr. of Suppression Hearing at 82, Testimony of Detective Doersam). And in fact, we conclude that adversarial proceedings against Taylor actually commenced prior to that point, when the state approved Detective Doersam's request to file a charge and arrest Taylor. *Id*. at 79-80. But notwithstanding any dispute on this point, Taylor's Sixth Amendment right to counsel was certainly effective at the time he was interrogated.

{¶ 30} Moving to the second question, it seems quite clear that not only did Taylor assert his right to counsel back in April, but that his trial counsel had been dealing with both prosecutors and police on Taylor's behalf for the entire eight-month period preceding Taylor's arrest and interrogation on December 12. Detective Doersam admitted that while he was "not a hundred percent" sure that Taylor was still represented, that no one—no prosecutor, no defense attorney, not Taylor himself—had ever indicated to him that Taylor was not still being represented by his counsel on the date in question. *See, e.g., id*. at 84. Detective Doersam was shockingly honest at the suppression hearing in testifying that he thought he had no reason to call Taylor's attorney unless Taylor himself specifically requested him to. *Id*. at 85. Even though Detective Doersam had been specifically advised by Taylor's attorney during the preceding eight months that Taylor "would not consent to an interview or proffer," *see* Nov. 5, 2018 Order & Entry at 4, Detective Doersam chose not to contact Taylor's attorney "because it's [Taylor's] decision * * *." Detective Doersam testified that he did not ask Taylor whether he was still represented "because I don't think the decision mattered -- or the answer didn't matter that much." *Id*. at 85. But despite Detective Doersam's belief on this point, there cannot be any dispute that Taylor both asserted and exercised his Sixth Amendment right to counsel.

{¶ 31} Finally, while it may seem clear that Taylor willingly signed the waiver of *Miranda* rights and submitted to Detective Doersam's questioning, that waiver must be

taken in the totality of the circumstances—which include the fact that Detective Doersam chose to begin the interrogation without notifying Taylor's lawyer and the fact that Detective Doersam and the state had already filed the charge and chose not to notify Taylor's counsel in the first instance. Given that Taylor's counsel had already informed all the state's representatives of his involvement and that Taylor would not voluntarily be speaking with them, we simply cannot conclude that under these circumstances Taylor's waiver of his right to *counsel* can be deemed knowing, voluntary, and intelligent, even if his waiver of his right to *remain silent* is. Had police respected Taylor's right to counsel, the interrogation would not have commenced until after Taylor's attorney had been given a chance to consult with his client.

**{¶ 32}** Taylor's statements during the December 12, 2016 interrogation must be excluded as a violation of his rights under the Sixth Amendment. His third assignment of error is therefore sustained, and the court's judgment overruling his motion to suppress must be reversed.

**{¶ 33}** Taylor's remaining assignments of error all assert error in the trial and sentencing proceedings—his fourth assignment of error challenges specific witness testimony based on a lack of foundation; his fifth assignment of error asserts the prosecuting attorney engaged in misconduct during closing argument; his sixth assignment of error asserts the trial court should have refrained from giving a nonstandard jury instruction regarding the authority of police officers during interrogations; his seventh assignment of error asserts that he received ineffective assistance of counsel during trial; his eighth assignment of error asserts his conviction was based on insufficient evidence and against the manifest weight of the evidence presented; and his ninth assignment of error asserts the sentence of 15 years to life violates the Ninth Amendment to the United States Constitution. Given our disposition of Taylor's second and third assignments of error, we find the issues raised in his remaining assignments of error to be moot.

**{¶ 34}** Taylor's first assignment of error is overruled, his second and third assignments of error are sustained and his remaining assignments of error are rendered moot. The Franklin County Court of Common Pleas judgment as to Taylor's conviction is vacated and its judgment overruling Taylor's motion to suppress is reversed. This case is remanded to the juvenile branch for further consideration.

*Judgment vacated in part and reversed in part,*
*cause remanded.*

MENTEL, J., concurs.

DORRIAN, J., concurs in part and dissents in part.

_____

DORRIAN, J., concurring in part and dissenting in part.

{¶ 35} I respectfully dissent from the majority's sustaining of the second assignment of error. In so doing, I consider that the facts before us differ from the facts in *State v. Smith*, ___ Ohio St.3d ___, 2022-Ohio-274, in that the juvenile court in *Smith* expressly found no probable cause existed for the same charges on which he was indicted and was found guilty of by the trial court to which Smith was bound over. *Smith* held: "We hold that the General Division of the Cuyahoga County Common Pleas Court lacked subject-matter jurisdiction over Counts 4, 6, 7, and 8 and the firearm specifications because the juvenile court found that the acts related to those counts and specifications were not supported by probable cause and thus the juvenile court could not have made an amenability determination with regard to those acts. There was thus a jurisdictional defect in the bindover process." *Id*. at ¶ 43.

{¶ 36} I concur with the majority's sustaining of the third assignment of error; however, I would consider, and not find to be moot, the remaining assignments of error.